*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

INNOVATION VENTURES, LLC, d/b/a LIVING
ESSENTIALS,
        *Plaintiff-Appellant/Cross-Appellee*,

        v.

N.V.E., INC.,
        *Defendant-Appellee/Cross-Appellant*.

Nos. 10-2353/2355

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:08-cv-11867—Lawrence P. Zatkoff, District Judge.

Argued: April 18, 2012

Decided and Filed: September 13, 2012

Before: BOGGS and GRIFFIN, Circuit Judges; BARZILAY, Judge.[*]

_____

**COUNSEL**

**ARGUED:** Glen D. Nager, JONES DAY, Washington, D.C., for Appellant/Cross-
Appellee. Leigh C. Taggart, RADER, FISHMAN & GRAUER PLLC, Bloomfield Hills,
Michigan, for Appellee/ Cross-Appellant. **ON BRIEF:** Glen D. Nager, Eric E. Murphy,
JONES DAY, Washington, D.C., Mark A. Cantor, Phyllis Golden Morey, Marc Lorelli,
BROOKS KUSHMAN P.C., Southfield, Michigan, for Appellant/Cross-Appellee. Leigh
C. Taggart, R. Terrance Rader, Douglas P. LaLone, Linda Mettes, RADER, FISHMAN
& GRAUER PLLC, Bloomfield Hills, Michigan, for Appellee/ Cross-Appellant.

---

[*]The Honorable Judith M. Barzilay, Senior Judge, United States Court of International Trade,
sitting by designation.

1

———————————

## OPINION

———————————

BOGGS, Circuit Judge.  This is a powerful appeal.  Innovation Ventures, LLC, d/b/a Living Essentials (LE), creator of the "5-hour ENERGY" energy shot, asserts that N.V.E. Inc. (NVE), creator of the "6 Hour POWER" energy shot, infringed its trademark, in violation of the Lanham Act.  15 U.S.C. § 1125(a).  After LE obtained a decision in its favor in another case against a different competitor, LE distributed a "recall notice" stating that NVE's "'6 Hour' energy shot" had been recalled.  NVE claims that the notice constituted false advertising in violation of the Lanham Act and anti-competitive conduct in violation of the Sherman Act,  15 U.S.C. § 2.  The district court granted cross-motions for summary judgment, dismissing the three claims that are now on appeal.  It first found that a likelihood of confusion did not exist between "6 Hour POWER" and "5-hour ENERGY" and then held that the recall notice did not constitute false advertising or a violation of the Sherman Act.  We reverse the judgment of the district court with respect to the trademark infringement and false advertising claims and affirm the judgment with respect to the Sherman Act claims.

## I

In September 2004, LE, a Michigan limited-liability company, began to test-market "5-hour ENERGY," an energy shot.  The Patent and Trademark Office denied LE's 2004 application for registration of "5-hour ENERGY" as a trademark on the grounds that the name was descriptive.  Starting in June 2005, LE marketed "5-hour ENERGY" in national drug-store chains, convenience stores, and retailers nationwide.

NVE, a New Jersey company, has been in the business of selling various diet, stimulant, and other nutritional products since 1980 under its Stacker 2® mark.  After declaring bankruptcy in August 2005 due to numerous lawsuits resulting from products containing ephedra, a substance banned by the FDA in 2004, NVE decided to enter the

energy-shot market. In March 2006, NVE introduced the "6 Hour POWER" energy shot. The packaging of the two products is shown below.

 

The preceding facts are largely undisputed. The rest of the litigation is complicated.

## II

In May 2008, LE brought suit against NVE, claiming trademark infringement under 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), and state common law, asserting that a likelihood of confusion existed between "5-hour ENERGY" and "6 Hour POWER." The district court declined to exercise supplemental jurisdiction and dismissed the common-law claims. NVE had filed two cases against LE in district court in New Jersey, also in May 2008, which were transferred to the Eastern District of Michigan and consolidated with this litigation in December 2008. NVE alleged eight counterclaims, primarily arising from a recall notice LE distributed: (1) violation of the Anticybersquatting Consumer Protection Act; (2) false advertising, in violation of 15 U.S.C. § 1125(a); (3) "business and product disparagement"; (4) tortious inference with contract; (5) tortious inference with business relations; (6) monopolization in violation of the Sherman Act; (7) attempted monopolization; and (8) violation of the Michigan Consumer Protection Act. LE and NVE filed cross-motions for summary judgment.

The district court granted summary judgment in favor of NVE, finding that a likelihood of confusion did not exist between "6 Hour POWER" and "5-hour ENERGY." The district court granted summary judgment in favor of LE on the nine counterclaims. LE appeals the grant of summary judgment with respect to the trademark-infringement claim. NVE appeals the grant of summary judgment with respect to the false-advertising and Sherman Act claims.

**III**

**A**

A claim under 15 U.S.C. § 1125(a) presents a mixed question of fact and law. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). When a district court grants summary judgment under § 1125(a), this court "appl[ies] an entirely *de novo* standard of review" to both the district court's review of the eight factors and its likelihood-of-confusion finding. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). "We therefore may affirm the grant of summary judgment to defendant only if the record, when viewed in the light most favorable to plaintiff, contains no genuine issue of material fact." *Ibid.*

The Lanham Act provides a private cause of action for violations of protected trademark rights:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

This court has adopted a two-step approach to consider claims under § 1125(a). First, we determine "whether the [plaintiff's] mark is protectable," and second, "whether

there is a likelihood of confusion as a result of the would-be infringer's use of the mark." *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005).

**B**

The parties dispute whether the plaintiff's mark is protectable—an issue the district court did not address.

NVE argues that "LE has no common law trademark rights superior to NVE: it failed to offer the evidence required to establish secondary meaning in any particular geographic area before NVE's first use of the accused mark in March 2006." Appellee Br. at 57. Specifically, asserting that "5-hour ENERGY" is only descriptive, NVE claims that LE failed to show that the mark was distinctive. Further, NVE argues that LE cannot prove that prior to March 2006—when "6 Hour Power" entered the market—"5-hour ENERGY" had acquired secondary meaning. *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595–96 (6th Cir. 1989).

**1**

First we consider whether LE waived this defense by not raising it in its initial brief. NVE claims that LE "did not contest the Court's ruling that the mark is descriptive" rather than distinctive. Appellee Br. at 45. Thus, NVE argues in its leading brief that any challenge with respect to the distinctiveness of the mark is waived. LE counters that it is not raising a new argument but responding to the alternative basis for affirmance advanced by NVE on appeal: "[w]hen an appellee raises in its answer brief an alternative ground for affirmance, the appellant is entitled to respond in its reply brief." *United States v. Brown*, 348 F.3d 1200, 1213 (10th Cir. 2003). NVE replies that this argument is inapposite, as arguments that "relate to the basis of the district court's ruling" are waived, even if responsive to arguments raised by appellee. *Id.* at 1210. According to NVE, "LE's new argument disputing descriptiveness not only relates to a basis of the district court's ruling but relates to one of the two pivotal factors." We read the district court's discussion of distinctiveness differently.

In consideration of the first of the eight factors in the test for likelihood of confusion—the strength of the plaintiff's mark—the district court found that, "[g]iven the *descriptive* nature of Plaintiff's mark, *i.e.*, that it provides users with five hours of energy, the mark itself has little strength." District Ct. Op. at 21–22 (emphasis added). Later, the district court concluded that, "[h]aving considered the above eight factors together, the Court finds that no genuine issues of material fact are present regarding the likelihood of confusion. Pivotal in the Court's decision is the dissimilarity between the marks, especially when combined with the *descriptive* nature of Plaintiff's 5-hour ENERGY mark." *Id.* at 26 (emphasis added). NVE reads the district court opinion as "explicitly identif[ying] the descriptive nature of 5-hour ENERGY as one of the two most important factors underlying its decision." NVE is correct about the district court's holding with respect to likelihood of confusion and strength of LE's mark. However, the district court was silent with respect to whether the mark was distinctive enough to warrant protection under the Lanham Act.

The district court's discussion of descriptiveness occurred in the context of determining that there was no likelihood of confusion, not in deciding whether the trademark was protectable. While distinctiveness was certainly "pivotal" for the former test, it was not even mentioned for the latter test. The district court's opinion did not contain any analysis about whether the mark was protectable. LE would not have been on notice that it needed to address in its initial brief an issue not even discussed by the district court. Consequently, there is no waiver, and we find that LE properly responded to the alternative basis for affirmance raised on appeal by NVE. We now turn to the merits.

**2**

NVE claims that the term "5-hour ENERGY" is not a distinctive mark, but is a descriptive mark.[1]  A descriptive mark, by itself, is not protectable.  However, "[a] merely descriptive term . . . can, by acquiring a secondary meaning, *i.e.*, becoming distinctive of the applicant's goods . . . , become a valid trademark." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (internal quotation marks omitted).  LE counters that the "5-hour ENERGY" mark is not descriptive, but rather is distinctive, due to the mark's suggestiveness.   Such a mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* at 362.  "Suggestive . . . marks are inherently distinctive and are protectable so long as the putative owner has actually used the mark." *Tumblebus*, 399 F.3d at 761 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  Because a suggestive mark is inherently distinctive, it "can be protected without proof of a secondary meaning." *Induct-O-Matic*, 747 F.2d at 362–63.

The "5-hour ENERGY" mark could be characterized as merely descriptive, in the sense that it simply describes a product that will give someone five hours of energy. But that is not the end of such an inquiry.  The first question one would ask is *how* would the energy be transferred?   Through food?  Through drink?   Through injections? Through pills? Through exercise?  Also, one would ask what kind of energy is the mark referring to? Food energy (measured in Calories)? Electrical energy? Nuclear energy? With some thought, one could arrive at the conclusion that the mark refers to an energy shot.  But it is not as straightforward as NVE suggests.  Such cognitive inferences are indicative of "suggestive" rather than descriptive marks.

---

[1]We note that, in contrast with its position in this case, in other litigation NVE has asserted that its own mark, "6 Hour POWER," is an "inherently distinctive" mark. *See* Complaint at ¶ 12, *N.V.E., Inc. v. N2G Distrib., Inc. & Alpha Performance Labs*, No. 2:08-cv-01824 (D.N.J. Apr. 14, 2008) ("The 6 HOUR POWER mark distinguishes NVE as the source of these products, is *inherently distinctive*, and has also become distinctive through the acquisition of secondary meaning." (emphasis added)).

The nature of the "5-hour ENERGY" mark "shares a closer kinship with those marks previously designated as suggestive than those labeled merely descriptive because of the degree of inferential reasoning necessary for a consumer to discern" that the "5-hour ENERGY" mark relates to an energy shot. *Tumblebus*, 399 F.3d at 763. The connection between "5-hour" and "ENERGY" is "not so obvious that a consumer seeing [5-hour ENERGY] in isolation would know that the term refers to" an energy shot rather than, for example, a battery for electronics, an exercise program, a backup generator, or a snack for endurance sports. *Ibid.* Connecting the mark "5-hour ENERGY" with the energy-shot product requires "imagination and perception to determine the nature of the goods." *Induct-O-Matic*, 747 F.2d at 362.

"The line between merely descriptive and suggestive marks is admittedly hazy and can be difficult to discern." *Tumblebus*, 399 F.3d at 763. However, we disagree with NVE's contention that the mark is not distinctive and thus not protectable. The "5-hour ENERGY" mark is "suggestive." We decline NVE's request to affirm on an alternate ground. Because the "5-hour ENERGY" mark is suggestive and thus protectable, we next consider whether a triable issue of likelihood of confusion exists.

## C

### 1

Whether a likelihood of confusion exists "is a mixed question of fact and law," but the ultimate determination of "whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630–31 (6th Cir. 2002). To prevail on its trademark infringement claim, plaintiff must show that defendant's mark creates a likelihood of confusion regarding the origin of the goods offered by plaintiff and defendant. *Id.* at 629. In determining whether a likelihood of confusion exists, the Sixth Circuit considers the following factors:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods
> or services offered by the plaintiff and the defendant, (3) the similarity
> of the marks, (4) any evidence of actual confusion, (5) the marketing

channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). While not all of the factors are relevant in every case, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Therma-Scan*, 295 F.3d at 630.

**2**

The district court found that factors two, five, and six weighed in favor of LE; factors one, three, four, and seven weighed in favor of NVE; factor eight was not applicable. "Pivotal in the Court's decision [was] the dissimilarity between the marks, especially when combined with the descriptive nature of Plaintiff's 5-hour ENERGY mark." District Ct. Op. at 26. The court found that there was no "likelihood of confusion merely because Defendant's mark, like Plaintiff's mark, describes the number of hours of energy that it will provide, especially where one focuses on 'ENERGY' and the other focuses on 'POWER.'" *Id.* at 27. Specifically with respect to factor seven, the district court found that LE failed to show that NVE adopted the "6 Hour POWER" mark with the intent to cause confusion and derive benefit from the reputation or goodwill of the plaintiff. "Defendant has presented credible evidence that it did not choose the 6 Hour POWER mark to intentionally copy Plaintiff's mark." *Id.* at 26.

**3**

LE focuses most of its attention on the seventh *Frisch*'s factor—whether NVE intentionally copied the "5-hour ENERGY" mark. The origin and inspiration of the name "6 Hour POWER" is in dispute—the accounts of NVE President Robert Occhifinto and former NVE Vice President Joe Palmeroni are in tension. On appeal, LE argues that the court should not have credited the testimony of Occhifinto but rather should have relied on the testimony of Palmeroni.

Occhifinto claimed that he chose the name "6 Hour POWER" for two reasons: first, the effects of the caffeine in the shot last approximately six hours; and second, the rhyming scheme of an earlier product named "TOWER OF POWER" led them to use the term "POWER." Even if NVE had previously used the term "TOWER OF POWER" for energy pills, this seems to be a convenient coincidence.

Palmeroni had a different recollection. Palmeroni testified that in early 2005—prior to LE's attempt to register "5-hour ENERGY"—Occhifinto directed a team to begin investigating the energy-shot industry and determine whether it was a viable market. Palmeroni discovered that "it was not a mature market at all, that it was a growing market, and that looked like the next big thing." During their market research, Palmeroni admitted that the team focused on "5-hour ENERGY," as it was "really the only one that we took seriously." Palmeroni stated in his deposition that LE's sales "were blowing up" and that NVE "needed to get [in] on this game or [it was] going to get left behind." NVE "started making mock-ups almost immediately." Specifically, with respect to choosing the name, he focused on having a shot that was better than a shot that lasts only five hours—namely, six hours.

When asked if he believed that "the name 6 Hour Power was selected by N.V.E. to trade off of the success and reputation of 5-Hour Energy," he answered "[y]es."[2] Palmeroni's testimony is not particularly helpful to LE and merely reflects that NVE looked for ways to compete with "5 hour ENERGY," not copy it. In fact, when Palmeroni raised possible issues relating to likelihood of confusion between the products, Occhifinto discussed ways to differentiate the products, *e.g.*, using a different color, to eliminate possible grounds of confusion. At a meeting prior to November 2005, Palmeroni "brought up that there may be possible copyright issues with the product." After he raised the issue about possibly "confusing the consumer," Occhifinto told him "well, we'll just change the color; it's a color issue and that I should, you know, not try to be a lawyer and try to be a salesman, which is what I was."

---

[2]NVE objected to this question during the deposition and asserts that it is an "inadmissible leading question." Appellee Br. at 50. We disagree.

NVE further challenges the reliability of Palmeroni's testimony. First, NVE fired Palmeroni on January 6, 2006, before it adopted the name "6 Hour POWER" in March 2006. Thus he was not involved with the final decision to select the name. However, he had already been involved in discussing "5-hour ENERGY" for some time. Additionally, Palmeroni and NVE are embroiled in other legal matters. In a case still pending in United States District Court in New Jersey, Civil Action 2:06-cv-05455, NVE is suing Palmeroni for receiving kickbacks from distributors of NVE's products. Finally, NVE alleges that Ozzy Torres, Esq., an "associate" of Palmeroni's, "proposed a deal where NVE would agree to drop its New Jersey case against Palmeroni in exchange for Mr. Palmeroni's favorable testimony at his upcoming deposition in this case." Apparently though, this was an offer NVE could refuse.

NVE moved to strike Palmeroni's testimony, which it claimed constituted perjury. The district court denied the motion as moot, finding that "the challenged exhibits were not relevant to the Court's disposition of Plaintiff's motions for summary judgment." District Ct. Op. at 27–28.

In any event, Palmeroni's testimony—even assuming it is accurate—is not very helpful to LE. Palmeroni was no longer with the company when Occhifinto made the decision to use the name "6 Hour POWER." It seems that any discussion of "5-hour ENERGY" at this early juncture focused on its large market share and the need to catch up, rather than to copy it. His participation in the development of the product prior to his departure shows, at best, that NVE sought to compete with LE, not to copy it. LE cannot show that NVE possessed an intent to derive a benefit from "5-hour ENERGY." If anything, evidence exists that NVE had independent reasons for choosing its mark as it attempted to compete with LE.

**4**

The only evidence, other than Palmeroni's deposition, that LE provided to show that NVE attempted to take advantage of the position of "5-hour ENERGY" as the first entrant into the market is an email sent by Dirk Nieuwenhuis to Palmeroni, Arthur Prindle, and Karen Finnochio (all employees of NVE) on November 10, 2005, with the

subject "Chaser Liquid Energy."  The email states:  "Just a heads-up.  Weren't we going to make a product like this for the c-stores [convenience stores].  I'll find out how the product is doing."  Attached to the message was a brochure for "5-hour ENERGY." However, this message simply reflected prior discussions to make a similar energy shot for convenience stores and notes that further market research would be conducted.

### D

This factually intensive issue is a close call and could, on a fair comparison of the evidence to date, be decided either way.  However, when the factors, as found by the district court, were so evenly balanced—a 4 to 3 split, with the eighth factor not at issue in this case—precedent counsels in favor of not granting summary judgment.  The district court said that it gave little weight to much of LE's evidence, which included a survey that used "highly leading questions," evidence of confusion from "third party witnesses," and forty alleged instances of consumer confusion.  This is the wrong posture to take on summary judgment.  *Big Daddy's*, 109 F.3d at 280 ("We therefore may affirm the grant of summary judgment to defendant only if the record, when viewed in the light most favorable to plaintiff, contains no genuine issue of material fact."); *see also Gen. Motors Corp. v. Keystone Auto. Indus., Inc.,* 453 F.3d 351, 359 (6th Cir. 2006) ("These genuine disputes of material fact render summary judgment inappropriate, a common disposition in evaluating likelihood of confusion."); *Levi Strauss & Co. v. Blue Bell, Inc*., 778 F.2d 1352, 1356 n.5 (9th Cir. 1985) ("[T]rial courts disfavor deciding trademark cases in summary judgments because the ultimate issue is so inherently factual.").  Summary judgment was improperly granted on this claim.

### IV

### A

NVE was not the only game in town that made energy shots with the name "6 Hour."  LE was also involved in two totally separate cases with two energy-shot producers other than NVE concerning products labeled "6 Hour Energy Shot" and

"6 Hour ENERGY!".   These other cases provide the foundation for NVE's false advertising claim.

**1**

N2G Distributing, Inc. (N2G) and Alpha Performance Labs (Alpha) distributed "6 Hour Energy Shot," a product (pictured on the right) *not* made by NVE.  In March 2008—in an action totally separate from the suit between LE and NVE—LE sued N2G and Alpha, asserting trademark and trade-dress claims.  The United States District Court for the Eastern District of Michigan entered a preliminary injunction and recall order enjoining the sale of "6 Hour Energy Shot" based on a trade-dress claim; however, the court did not find that the name



infringed LE's trademark.  LE claims that the defendants issued the recall order only to their customers and not to retailers who purchased the product from third parties.  After the recall had been completed, LE took it upon itself to send an additional recall notice, dated May 29, 2008, to 110,000 convenience stores and truck stops and to place a notice in retailer magazines.

The notice read:

**RECALL OF "6 HOUR" SHOT ORDERED**

*Court orders immediate stop to manufacturing, distributing and sale of 6 Hour Energy shot.*

Dear Customer,

We are pleased to announce that we won a decision against a "6 Hour" energy shot that closely mimicked 5-Hour Energy®. The United States District Court, in Case No. 08-CV-10983, issued a preliminary injunction ordering the immediate recall of the "6 Hour" product, and told its manufacturer to stop making, distributing and selling it.

If you have any of the "6 Hour" energy shots in your store(s) or warehouse(s) contact the product's manufacturer or your distributor to return the product immediately.

**DO NOT RETURN ANY 5-HOUR ENERGY®**. It can be difficult to tell 5-Hour Energy® apart from the "6 Hour" knockoff product. If you have any questions, please call us at 248-960-1700 ext. 217.

We will vigorously protect the 5-Hour Energy® brand by pursuing all legal avenues against anyone encroaching on it, or creating confusion in the marketplace.

**2**

In April 2008, after LE sent this notice, BDI Marketing, Inc. (BDI)—which sold a product called "6 Hour ENERGY!" (different from "6 Hour Energy Shot" and *also* not made by NVE)—sued LE in the Eastern District of Michigan for false advertising (this suit is also totally unrelated to the matters between LE and NVE). BDI moved for a preliminary injunction, alleging that LE's recall notice constituted false advertising, in violation of Section 43 of the Lanham Act. Magistrate Judge Pepe recommended that the injunction be granted. "Living Essentials did not win a decision against a '"6 Hour" energy shot' as stated in the press release, but rather won a decision against N2G's use of a[n] overall product image (i.e. - the label and bottle) that was confusingly similar to Living Essentials' overall product image." *Living Essentials v. BDI Mktg.*, No. 2:08-cv-12711, 2008 U.S. Dist. LEXIS 116678, at *9–10 (E.D. Mich. Oct. 28, 2008). The magistrate judge concluded that BDI demonstrated a likelihood of success on the merits of its claim that the legal notice was misleading and had a tendency to deceive its intended audience. *Ibid.* District Judge Rosen adopted the magistrate judge's report and recommendation and granted a preliminary injunction against LE: "Living Essentials could easily have avoided any possibility of confusion by identifying the actual manufacturer and product enjoined in its release."

**B**

**1**

NVE asserts on appeal that the recall notice LE distributed constituted false advertising. Section 1125(a) prohibits "[a]ny person [from] . . . us[ing] in commerce any word, term, name, symbol, or device . . . which . . . in commercial advertising or promotion,

misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). "Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *see also Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) (holding that "a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both").

NVE asserts that a jury could reasonably find that the notice:  (1) was "literally false"; or (2) was "misleading" and deceived the intended audience. *See Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695–96 (6th Cir. 2000). The former theory focuses on the plain language of the notice, while the latter focuses on how the notice was perceived by its intended audience. The district court in the proceedings below in this case found that the notice was neither literally false nor misleading, disagreeing with the conclusion of the *BDI* court. District Judge Zatkoff found that "Judge Rosen's opinion and order adopting the Report and Recommendation did not state that the legal notice was *false*; rather, Judge Rosen concluded only that the legal notice was *misleading*." District Ct. Op. at 11. Judge Zatkoff further disagreed with Magistrate Judge Pepe's conclusions in *BDI*:

> [I]t is undisputed that Plaintiff was awarded injunctive relief against the producer of an energy shot bearing the name "6-Hour," as stated in the notice. Stating that the decision was based on the use of an overall product image would have, perhaps, provided more clarity, but the absence of the explanation for the injunctive relief does not render the statement literally false.

*Ibid*. Parsing the language of the notice, Judge Zatkoff found that though the notice was ambiguous—"it did not state which product had been recalled"— it was not deceiving. *Id.* at 13.

**2**

Where statements are literally true yet deceptive or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception. A plaintiff relying on statements that are literally true yet misleading "cannot obtain relief by arguing how

consumers could react; it must show how consumers actually do react." *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir.1990). On the other hand, where statements are literally false, a violation may be established without evidence that the statements actually misled consumers. *See, e.g.*, *Johnson & Johnson, Inc. v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272 (2d Cir. 1987). Actual deception is presumed in such cases. *See U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir. 1986). "A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Novartis,* 290 F.3d at 586–87 (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000)). "'The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported.'" *Id.* at 587. (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998)).

**3**

The language of the recall notice teeters on the cusp between ambiguity and literal falsity in two main respects—descriptive and grammatical.

First, the notice could be viewed as either ambiguous or false with respect to how the product is named. Towards the top, the notice simply referred to "'6 Hour' Energy shot"—in the notice "6 Hour" was in quotations, while "Energy shot" was not—without a prefatory article. At no point does the notice identify the name of the recalled product, "6 Hour Energy Shot." Read broadly, this could be considered ambiguous, as it does not specify which product was the subject of the recall; on further reflection, one could understand which products were and were not recalled. Read narrowly, this could be literally false—only a product specifically called "6 Hour Energy Shot" was recalled, not any energy shot whose name contained the words "6 Hour." The notice never referred to the product as "6 Hour Energy Shot" in one complete phrase.

Only one product, "6 Hour Energy Shot," and not other "6 Hour" products, such as "6 Hour POWER," were subject to the recall. At the time, there were several other energy shots, in addition to NVE's, with the phrase "6 Hour" in the title, such as "6 Hour Energy!" (made by BDI) and "Extreme Energy Six Hour Shot" (made by Ener Formulations Ltd.). None of these were recalled. Relatedly, LE wrote that it "w[o]n a decision against a '6 Hour' energy shot." This statement is not literally true—LE won a decision against N2G's use of an overall product image, *i.e.*, the label and bottle, that was confusingly similar to LE's overall product image.

Second, the notice uses different prefatory words to introduce the recalled product. At some points the notice uses an indefinite prefatory article, "a," to refer to "a '6 Hour' energy shot," suggesting that there may be more than one possible product at issue. At other points, the notice uses the prefatory pronoun "any": "If you have *any* of the '6 Hour' energy shots in your store(s) or warehouse(s) contact the product's manufacturer"—whoever they may be—"or your distributor to return the product immediately." (emphasis added). By saying "any" of the shots, the notice suggests that *any* shot bearing the name "6 Hour" was subject to recall. Elsewhere, the notice uses the prefatory definite article "the": "If you have any of *the* '6 Hour' energy shots in your store(s) or warehouse(s) contact the product's manufacturer or your distributor to return *the* product immediately." (emphasis added). This definite article suggests that there is only one specific product at issue, though the statement as a whole fails to specify exactly what product.

Justice Kagan recently had the occasion to opine on the subtle difference between "not an" and "not any":

> Truth be told, the answer to the general question "What does 'not an' mean?" is "It depends": The meaning of the phrase turns on its context. *See Johnson v. United States*, 559 U.S. ____, ____, 130 S. Ct. 1265, 1270, 176 L. Ed. 2d 1 (2010) ("Ultimately, context determines meaning"). "Not an" sometimes means "not any," in the way Novo claims. If your spouse tells you he is late because he "did not take a cab," you will infer that he took no cab at all (but took the bus instead). If your child admits that she "did not read a book all summer," you will surmise that she did not read any book (but went to the movies a lot). And if a sports-fan friend bemoans that "the New York Mets do not have a chance of winning the World Series," you will gather that the team has no

chance whatsoever (because they have no hitting). But now stop a moment. Suppose your spouse tells you that he got lost because he "did not make a turn." You would understand that he failed to make a particular turn, not that he drove from the outset in a straight line. Suppose your child explains her mediocre grade on a college exam by saying that she "did not read an assigned text." You would infer that she failed to read a specific book, not that she read nothing at all on the syllabus. And suppose a lawyer friend laments that in her last trial, she "did not prove an element of the offense." You would grasp that she is speaking not of all the elements, but of a particular one. The examples could go on and on, but the point is simple enough: When it comes to the meaning of "not an," context matters.

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1681 (2012). We answer this query the same way our Circuit Justice did: "it depends." And "it depends" cannot support a claim of literal falseness. "[O]nly an unambiguous message can be literally false." *Novartis*, 290 F.3d at 587. While it is a close question whether the notice is literally false, we canot say that it is unambiguously so. However, we hold that a genuine dispute exists as to whether the notice was misleading and tended to deceive its intended audience.

## C

## 1

Focusing on how the notice would have impacted retailers, rather than consumers, the district court excluded as inadmissible hearsay all evidence introduced by NVE to show that "various unidentified retailers contacted them because they were confused by the legal notice." District Ct. Op. at 11–12. The district court observed that NVE submitted only one named distributor who complained that he lost sales after the notice, "but given that the legal notice was distributed to over 100,000 retailers nationwide, this hardly constitutes evidence that a significant portion of the intended audience was actually deceived." *Id.* at 12. The court held that NVE "failed to establish, with admissible evidence, sufficient facts demonstrating that the legal notice actually deceived a substantial portion of the intended audience." *Id.* at 12–13.

**2**

NVE argues on appeal that the district court erroneously dismissed documentary and testimonial evidence from NVE, distributors, and brokers showing confusion as to whether NVE's product, "6 Hour POWER," had been recalled. Following the recall, NVE and its distributors received a number of calls from convenience stores and truck stop retailers—the very people that received the recall notice—who wanted to return "6 Hour POWER." One NVE employee stated that the notice caused a "huge nightmare" and the phones were "blowing off the hook" with calls to return the product. NVE claimed that at least one sales program—which involved a "road trip" to place corrugated display tops "all over New Jersey"—"just died" after the recall notice.

NVE's Michelle Canzone stated that she received "phone calls from brokers and customers and faxes of this legal notice sent to us and that's when the nightmare began. . . . [I]nitially, we started getting faxes and inquiries from our customer base, and then the phone calls just started pouring in from all little mom and pop shops all over the United States, you know, asking if they should pull our product." JR Merlau, Vice-President at Novelty, Inc., a distributor of "6 Hour POWER," testified: "[T]his notice was confusing to the marketplace. It caused a lot of issues within our customers. We had to send out notices to our customers to advise them that none of the products we were selling was subject to this recall." Jim Green, Vice-President of Purchasing/Marketing for wholesaler Liberty USA, was "immediately inundated with calls from customers that were confused" and "wanted to return NVE's 6 HOUR [sic] POWER."

Karen McClellan was the Category Buyer responsible for energy shots at CoreMark, which distributes to more than 29,000 convenience stores nationwide. On June 16, 2008, she sent a notice to all United States division buyers to warn against spreading e-mails containing the recall and creating "panic." Asked about the last sentence of her notice—"I hope this clears up the confusion that this letter has created"—Ms. McClellan testified: "I was confused by the letter. . . . I had to read it thoroughly a few times and then I had to talk to Rise [Meguiar, LE's Sales Vice President,] and several other people to ask them exactly what it is about so I knew specifically." Still experiencing problems over a month later, on July 22, 2008, Ms.

McClellan emailed LE for "help" to clear up continuing questions about returning "6 Hour POWER." Customers were calling with "questions" about sending back "perfectly good Stacker 2 6 Hour Power" because "the customer thinks it is this other stuff."

**3**

The district court, citing an opinion from the Southern District of Ohio, stated that NVE's proffered evidence of confusion constituted hearsay. *See Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 195 F. Supp. 2d 1024, 1033 (S.D. Ohio 2001) ("[T]he only evidence of deception are the hearsay statements of a customer . . . who told Comeaux that two of *his* customers were confused by the Announcement. Defendants argue correctly that the hearsay statements of [the] customer are inadmissible and, therefore, do not create a genuine issue of fact on deception."). The district court's reliance on *A2Z* was misplaced.

First, the strict application of the rules of evidence to a claim that depends on showing customer confusion places too heavy a burden on NVE. Should we expect a sworn statement or affidavit from a retailer who calls into a distributor and claims to have been confused? Second, the phone calls were not relied on to show the content of the conversations, but rather were introduced merely to show that the conversations occurred and the state of mind of the declarants. Fed. R. Evid. 803(3). The fact that so many people called NVE immediately after receiving the notice *at the very least* raises a genuine issue of material fact as to whether a significant portion of the recipients were misled.

Relatedly, on appeal LE characterizes these phone calls as "non-actionable customer inquiries." The phone calls at issue were not mere inquiries, such as the inquisitive letter at issue in *Balance Dynamics*. 204 F.3d at 694. To the contrary, many distributors called to stop buying "6 Hour POWER" after the notice was issued. NVE claims that after the recall, its sales growth for "6 Hour POWER dropped from 13.7% to 1.1%." NVE's damages expert estimated that NVE lost $3.4 million in sales as a result of the recall notice. A jury could find that these were not just inquiries; they were calls that resulted in lost sales. All of these calls evidence a belief that "6 Hour POWER" had been recalled. Had the callers lacked such a mistaken belief, such phone calls would not have occurred.

NVE sent out its first corrective notice to its distributor base on June 11, 2008, and sent another directly to convenience stores on September 15, 2008. Further, a number of distributors sent out their own corrective notices so retailers would not think "6 Hour POWER" had been recalled. NVE does not introduce evidence about these corrective notices for the truth of the matters asserted therein but rather to provide circumstantial evidence that some retailers believed that there was in fact a recall on "any of the '6 Hour' shots in your store," including "6 Hour POWER," and that NVE took actions to alleviate these concerns. There is more than enough evidence to survive summary judgment. Whether the evidence shows that the retailers were "tricked into believing an untruth about" "6 Hour POWER" is an issue for trial. *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 617 (6th Cir. 1999) (*Podiatric I*).

**V**

**A**

NVE further argues that LE violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by: (1) asserting a fraudulently obtained supplemental trademark registration; (2) falsely advertising in connection with the legal notice; (3) offering incentives to retailers for superior product placement; (4) requesting that its retailers sell its product at the exclusion of other energy-shot products; and (5) registering the "6hourpower.com" and "sixhourpower.com" internet domain names. The district court recognized that all of NVE's alleged damages for these claims were connected to the recall notice and nothing else. It thus found that claims one, three, four, and five failed because of a lack of damages.

On appeal, NVE claims that the recall notice was part of a broader "anticompetitive scheme." NVE concedes that "[w]hile NVE did not pursue damages specific to those other substantial anticompetitive acts [claims 1, 3, 4, and 5], the Legal Notice was part and parcel of LE's entire scheme of anticompetitive conduct." In his deposition, NVE's damages expert, Carl Degen, stated: "[I]t's my opinion that the result of the letter was a loss of 3.4 million dollars . . . My damages calculation of 3.4 million is all of the losses suffered by [Defendant] as a result of the letter." Degen's expert report similarly states that his quantification of

damages was limited to those that occurred after June 14, 2008—roughly when the recall notice was distributed.[3] We agree with the district court that because NVE specified damages resulting only from the recall notice, we should consider only the anti-competitive effects of the recall notice.  All other issues are waived.

**B**

Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.  "Section 4 of the Clayton Act permits a private suit for violations of § 2 and the recovery of treble damages to those who succeed on their claims under the Sherman Act." *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007) (citing 15 U.S.C. § 15).  A successful claim under Section 2 of the Sherman Act requires a two-part showing: "(1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'"  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595–96 (1985)). "In addition, in this circuit, an antitrust [claimant] must show that (1) the alleged violation tended to reduce competition overall and (2) the [claimant's] injury was a consequence of the resulting diminished competition." *J.B.D.L. Corp.*, 485 F.3d at 887.

---

[3] Degen stated: "My calculations do not quantify NVE's loss *prior* to June 14, 2008, and because Living Essential's cybersquatting and exclusionary practices occurred both *before* and *after* June 14, 2008, my calculations of NVE's harm subsequent to June 14, 2008 represent a lower bound for this period. These damages quantify NVE's harm since June 14, 2008 due to its claim under False Designation of Origin of Products, False Advertising and False Description and Representation (Count II); Business and Product Disparagement (Count III); Tortious Interference with Contractual Relationship (Count IV); Tortious Interference with Business Relationships (Count V); Violation of the Sherman Act - Monopolization (Count VI); Violation of the Sherman Act - Attempted Monopolization (Count VII); and Violation of Michigan Consumer Protection Act (Count VIII)."

Moreover, the claimant "bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage." *Conwood*, 290 F.3d at 788. "The [alleged perpetrator's] actions need not be the sole proximate cause of any alleged injuries, but 'must be proved as a matter of fact and with a fair degree of certainty.'" *J.B.D.L. Corp.*, 485 F.3d at 887 (quoting *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001)). "To survive summary judgment [a claimant] must allege facts sufficient for a jury to find that the defendant acquired, maintained, or attempted to acquire a monopoly through actions harmful to competition." *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003) (*Podiatric II*).

## C

The district court found that NVE pleaded only the distribution of the recall notice as a material cause of antitrust injury. To rebut the "presumption that [an advertisement] had a *de minimis* effect on competition," a claimant must demonstrate that "(1) the advertising was clearly false, and (2) it would be difficult or costly for the [claimant] to counter the false advertising." *Id.* at 370–71. Because the district court concluded that the legal notice was not false, it concluded that NVE "failed to rebut the presumption that the legal notice had a de minimus [*sic*] effect on competition" and granted summary judgment with respect to the antitrust claims.

## D

This court has held that "even false advertising would not damage competition and hence be a violation of the Sherman Act unless it was so difficult for the plaintiff to counter that it could potentially exclude competition. Monopoly power is the power to exclude competition or control prices." *Podiatric II* , 323 F.3d at 372 (citing *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). Isolated business torts, such as falsely disparaging another's product, do not typically rise to the level of a Section 2 violation unless there is a harm to competition itself. *Conwood*, 290 F.3d at 783. As the Supreme Court has

emphasized, the Sherman Act protects competition, not competitors. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *cf. Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230–31 (3d Cir. 1988) (rejecting a Section 2 claim regarding defendant's disparagement of plaintiff's box office potential because defendant's conduct was "consistent with legitimate competitive conduct").

"There can be no harm to competition, such as the exclusion of competitors, when the victims of false advertising are easily able to counter it." *Podiatric II*, 323 F.3d at 372. After the notice was distributed, even if it contained "clearly false" information, it was relatively simple for NVE to counter it by sending notices that "6 Hour POWER" had not been recalled. In fact, NVE and a number of its distributors sent such notices to retailers. This is sufficient to defeat the antitrust claim.

## VI

The judgment of the district court is REVERSED in part and AFFIRMED in part, and this action is REMANDED for further proceedings not inconsistent with this opinion.