RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

COTY LEWIS, individually and on behalf of a class of
similarly situated persons,

*Plaintiff-Appellant,*

⎤
⎟
⎟
⎬  No. 22-1406
⎟
⎟
⎦

*v.*

ACUITY REAL ESTATE SERVICES, LLC; KEVIN
STUTEVILLE,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:21-cv-12319—Thomas L. Ludington, District Judge.

Argued:  December 8, 2022

Decided and Filed:  April 4, 2023

Before:  MOORE, STRANCH, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for
Appellant.  Jonathan B. Frank, FRANK & FRANK LAW, Bloomfield Hills, Michigan, for
Appellees.  **ON BRIEF:**  Matthew E. Gronda, MATTHEW E. GRONDA, J.D., P.L.C., St.
Charles, Michigan, for Appellant.  Jonathan B. Frank, FRANK & FRANK LAW, Bloomfield
Hills, Michigan, for Appellees.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge.  Acuity Real Estate Services operates a website that connects
people looking to buy or sell homes with a local real-estate agent in their area.  Acuity offers its

services for free to home buyers and sellers but requires realtors to pay a fee for referrals. The real-estate broker that employed Coty Lewis, a real-estate agent, signed up to receive Acuity's referrals. The broker required its agents (including Lewis) to pay Acuity's fee out of their commissions from home sales. In this suit, Lewis alleges that Acuity makes false claims to home buyers and sellers on its website and that this false advertising violates the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). But the Lanham Act provides a cause of action only for businesses that suffer commercial injuries (such as lost product sales) from the challenged false advertising. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014). The Act does not provide a cause of action for customers who suffer consumer injuries (such as the cost of a defective product) from the false advertising. *See id.* And here, Lewis alleges this type of consumer harm as his injury from Acuity's allegedly false advertising: He seeks to recover the referral fee (that is, the price) he paid for Acuity's services. Because Lewis may not bring this claim under the Lanham Act, we affirm the district court's dismissal of his complaint.

I

Because this case comes to us from an order granting a motion to dismiss, we must accept the complaint's well-pleaded factual allegations as true. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020).

Lewis, a licensed real-estate agent, provides his realtor services to buyers and sellers of homes in and around Saginaw County, Michigan. Compl., R.1, PageID 2. At the times relevant to this suit, he was a member of Re/Max New Image, a brokerage company. *Id.*, PageID 6.

In the internet age, many prospective home buyers and sellers use online searches to find realtors. The frequency of these internet searches has led to a new industry of companies that operate what Lewis calls "online real estate referral network[s]." *Id.*, PageID 3. Among other competitors, Acuity provides one of these referral networks. *Id.* Kevin Stuteville founded and manages Acuity. *Id.*, PageID 2.

A potential customer's internet search for realtors may bring back a "hit" for Acuity's website: www.effectiveagents.com. *See id.*, PageID 3. On this website, Acuity allegedly tells customers that it has a "proprietary algorithm" designed to match the "perfect" real-estate agent

to their unique needs. *Id.* Acuity also assures customers that it has rigorously screened the 1.5 million realtors in the United States and included only a small number of "hand-picked" and "top talent" realtors on its site. *Id.*, PageID 4. Perhaps best of all for these customers, Acuity informs them that it offers its referral services free of charge. *Id.* The customers need only fill out a form on Acuity's website providing their contact information. *Id.*

According to Lewis, Acuity's statements to these customers do not match reality. He alleges that Acuity does not undertake any detailed "mathematical analysis" to find the perfect realtor. *Id.*, PageID 6. Rather, Acuity allegedly sends customers to any realtor willing to pay its referral fee. *Id.* And its only alleged expertise consists of designing a website that will be among the top results when customers search for realtors in web browsers. *Id.*, PageID 10.

In 2019, Lewis's brokerage firm, Re/Max, contracted with Acuity for referrals. *Id.*, PageID 6. Re/Max agreed that its agents would pay 35% of their commissions to Acuity for each successful home sale involving an Acuity-referred buyer or seller. *Id.*, PageID 6–7.

In October of that year, Lewis received a referral from Acuity indicating that a potential customer named Lillian Garrett was looking to sell her Saginaw home. *Id.*, PageID 7–8. As it turns out, Garrett's son-in-law filled out the form on her behalf because the 93-year-old Garrett had moved to a nursing home. *Id.*, PageID 10. Undertaking his due diligence, her son-in-law also provided Garrett's information to a competing online referral network, Agent Pronto, which sent a second referral to Lewis. *Id.*

After receiving the referrals from both Acuity and Agent Pronto, Lewis contacted Garrett's son-in-law and successfully sold her home. *Id.*, PageID 11. Lewis paid Agent Pronto its referral fee. *Id.* But Acuity sought its fee too. *Id.* When Lewis refused to pay a second time, Acuity sued him in a Florida court (relying on a venue provision to which Re/Max had agreed in its contract with Acuity). *Id.* Acuity won this breach-of-contract suit and obtained its attorney's fees, so Lewis had to pay a judgment that was over twice the size of the commission he had earned for selling Garrett's home. *Id.* According to Acuity, when two real-estate referral networks send the same referral, its contract requires a realtor to pay the network that first sends

the referral.  Acuity won its suit against Lewis because it sent him its referral of Garrett ahead of Agent Pronto.  Appellees' Br. 6.

Having lost the Florida case, Lewis brought this suit against Acuity on behalf of himself and a putative class of "real estate agents, brokers, and professional[s] who paid, or are liable for, payment of a referral fee to Acuity."  Compl., R.1, PageID 12.  He alleged that Acuity engaged in false advertising in violation of the Lanham Act by misleading home buyers and sellers into thinking that it uses sophisticated means to find the realtor best suited for them.  *Id.*, PageID 15; 15 U.S.C. § 1125(a)(1)(B).  Acuity's conduct allegedly injured Lewis because customers might have found him directly (rather than through Acuity) without its false statements.  Compl., R.1, PageID 16.  In that scenario, he would not have been on the hook for Acuity's referral fee.  *Id.*

The district court granted Acuity's motion to dismiss Lewis's complaint.  *See Lewis v. Acuity Real Est. Servs., LLC*, 597 F. Supp. 3d 1154, 1156 (E.D. Mich. 2022).  The court held that the Lanham Act does not permit customers to sue over false advertisements and that Lewis's allegations showed that he was Acuity's customer.  *See id.* at 1158–59.  It next held that Lewis failed to plausibly plead that Acuity's online statements to home buyers and sellers caused him an injury.  *See id.* at 1159–60.  At the same time, the court rejected Acuity's alternative argument that its online statements to home buyers and sellers do not qualify as "commercial advertising" under the Lanham Act because they do not pay anything for its services.  *See id.* at 1160–62.  We review the district court's decision de novo.  *See Rudd*, 977 F.3d at 511; *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 626–27 (6th Cir. 2010).

II

On appeal, the parties debate all three questions that the district court answered: Did Lewis plausibly allege the type of commercial injury that permitted him to sue under the Lanham Act?  Did he plausibly allege that the statements on Acuity's website proximately caused an injury to him?  And did those statements qualify as "commercial advertising" under the Act?  To resolve Lewis's appeal, however, we need not proceed past the first question.  The district court properly dismissed this suit because Lewis's complaint pleaded a consumer injury that resulted only from his status as Acuity's customer rather than its competitor.

The Lanham Act prohibits a "person" from using a "false or misleading description" or "representation of fact" in "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin" of the person's or another's "goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). The Act expressly authorizes "a civil action by any person who believes that he or she is or is likely to be damaged by" the false advertising. *Id.* § 1125(a)(1).

On its face, this text could be read to place no limits on the injured parties who may sue over false advertising. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). Nearly anyone might claim to have been "damaged" by a business's false advertising. Consumers might argue that they would not have bought the business's poor product except for the false claims in its advertising. *See id.* at 132. Competitors might argue that they lost sales because the false advertising caused consumers to buy the business's product rather than their own. *See Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 712 (4th Cir. 2016). Distributors of the business's product might argue that its false advertising harmed their reputations because they became associated with a lemon product. *See The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 40–41 (3d Cir. 2015). Even the business's shareholders might argue that the false advertising caused the business's stock prices to go down when the falsity came to light.

But courts have never read the Lanham Act to permit suit by all parties who can show an injury. *See Lexmark*, 572 U.S. at 129. That is because we must read all statutory causes of action, including the Lanham Act's cause of action, against background interpretive rules. *See id.* Under one rule with common-law roots, courts will interpret a statute's private right of action to authorize a suit only by those potential "plaintiffs whose interests 'fall within the zone of interests'" that the law protects. *Id.* at 129–30 & n.5 (citation omitted); *Bennett v. Spear*, 520 U.S. 154, 163 (1997). Although the Supreme Court at one time described this zone-of-interests test as a "prudential standing" doctrine that judges could apply in seemingly common-law fashion, it has now made clear that the test asks an ordinary question of statutory interpretation: Is the specific statutory text best read to grant a cause of action to a specific plaintiff? *Lexmark*, 572 U.S. at 126–28.

In *Lexmark*, the Court held that the zone-of-interests test applies to the Lanham Act's cause of action "for false advertising under § 1125(a)." *Id.* at 131; *see also id.* at 129–32. To identify the "damaged" parties for which this cause of action offers a remedy, the Court interpreted it together with the Act's statement of purposes. *See id.* at 131. Highlighting the purpose most relevant to false advertising, the Court explained that Congress's "intent" in passing the Act was "to protect persons engaged in [interstate] commerce against unfair competition[.]" *Id.* (quoting 15 U.S.C. § 1127). The Act's use of this common-law term of art ("unfair competition") revealed a narrow goal to protect parties only against "injuries to business reputation and present and future sales." *Id.* The Court thus interpreted the zone of interests for false-advertising claims to include only businesses that complain about an "injury to a commercial interest in reputation or sales." *Id.* at 131–32. It concluded, by contrast, that consumers do not fall within this zone of interests even if they waste money on a useless product because the traditional unfair-competition tort did not encompass this consumer harm. *See id.* at 131–32. After *Lexmark*, then, a plaintiff suing under § 1125(a) of the Lanham Act must allege a commercial—not a consumer—injury.

*Lexmark* did not offer much guidance on how to distinguish between these two types of injuries, recognizing the "nebulous" nature of the inquiry. *Id.* at 135. That said, the Court did provide two useful data points showing that it is the nature of the *injury* (not the nature of the *plaintiff*) that matters. On the one hand, the Court clarified that, as long as the plaintiff sues for business or reputational harms, the plaintiff need not be a "direct competitor" of a false advertiser to assert a claim against it. *Id.* at 136. The dispute between Lexmark and Static Control in *Lexmark* itself proves this point. Lexmark made toner cartridges for its laser printers, and its competitors refurbished and resold Lexmark's used cartridges. *Id.* at 121. Static Control did not itself resell these used cartridges in competition with Lexmark; it instead sold parts to Lexmark's competitors so that they could do so. *Id.* Lexmark told end users of the cartridges that they must obtain them from Lexmark, and it told Static Control's customers (Lexmark's competitors) that Static Control's business violated federal law. *Id.* at 123. Static Control brought false-advertising claims against Lexmark for these allegedly false statements. *Id.* It asserted that Lexmark's statements had caused it to lose sales to customers (Lexmark's competitors) and had damaged its business reputation. *Id.* at 137. The Court had "no doubt" that

these commercial injuries fell within the Act's zone of interests even though Static Control did not directly compete with Lexmark. *Id.*

On the other hand, the Court concluded that even commercial businesses that sell goods to end users may qualify as "customers" who cannot sue under the Act—depending on the nature of their injuries. The Court gave as an example a business that buys a defective input from a "supplier" based on the supplier's false advertising. *Id.* at 132. The Court noted that this business could not sue the supplier under the Act to recover damages for the "inferior" input. *Id.*

This divide requires us to focus on whether Lewis seeks to recover for a commercial or consumer injury. Recall that he alleges that Acuity's website falsely advertised the nature of its referral network to the end buyers and sellers of real estate. Compl., R.1, PageID 15. If Acuity had not engaged in this false advertisement, Lewis says, these home buyers and sellers may have found his services in other ways. *Id.*, PageID 16. Acuity's false advertising thus allegedly harmed Lewis because he had to pay the 35% referral fee that he would not have been forced to pay if he had closed on a home without the referral. *Id.* Confirming that the payment of this referral fee sits at the center of Lewis's suit, he cabined his proposed class to include only those realtors "who paid, or are liable for, payment of a referral fee to Acuity[.]" *Id.*, PageID 12.

These allegations leave "no doubt" that Lewis sues to recover for a consumer injury that he incurred as Acuity's customer. *Lexmark*, 572 U.S. at 137. The referral fee that Lewis now asks Acuity to return to him is the "price" that he paid for Acuity's services. And a person who makes a payment to a party in exchange for a service from the party is generally described as the party's "customer." Because Lewis uses Acuity's services to help him perform his real-estate job, he is analogous to the hypothetical company "misled by a supplier into purchasing an inferior product" that *Lexmark* said falls outside the Act. *Id.* at 132. The same rule applies both to companies that seek a good to run a business and to end users who seek only to consume the good: the Lanham Act simply does not cover parties who are "hoodwinked into purchasing a disappointing product," *id.*, because that injury does not constitute "unfair competition," 15 U.S.C. § 1127.

Conversely, no reasonable person would describe Lewis's payment of this referral fee as a commercial injury to his "reputation or sales." *Lexmark*, 572 U.S. at 131. As for sales, whenever this injury arose (that is, whenever Acuity requested its fee), Lewis will have gained, not lost, a sale. This fact distinguishes the cases on which Lewis relies because the plaintiffs there claimed that the defendants' false advertising diverted sales away from (not toward) them. *See ThermoLife Int'l, LLC v. Compound Sols., Inc.*, 848 F. App'x 706, 709 (9th Cir. 2021) (memorandum); *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 825–26 (9th Cir. 2011). As for reputation, Lewis makes no claim that his payment of this referral fee injured his status in the realtor market in any way. Nor does he allege any reputational harm from, say, Acuity's online description of the realtors in its network (including Lewis) as "top talent." Compl., R.1, PageID 4.

In response, Lewis contends that he has asserted a commercial injury because he competes with Acuity in that both are "licensed real estate sales professional[s] whose business is premised on finding consumers interested in buying or selling a home." Appellant's Br. 13. Here again, however, whenever Lewis pays Acuity the referral fee (his purported injury), Acuity will have sought out buyers and sellers on his behalf, not to divert sales away from him. And while the referred buyers and sellers may also qualify as Acuity's customers, that fact does not turn Lewis into Acuity's competitor. To the contrary, Acuity operates "what economists call a 'two-sided platform.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018). Like credit-card companies that seek to connect purchasers of goods and services and the merchants that sell those goods and services, Acuity has customers on *both* sides of its platform (home buyers and sellers on one side and the realtors who seek to help them on the other). *See id.* at 2280–81. This type of platform often tends to charge a higher price to the side with the more inelastic demand curve, which may explain why Acuity's customers receive its services for free while real-estate agents must pay for them. *See id.* at 2281. Be that as it may, both the home buyers and sellers and the realtors "jointly consume[]" Acuity's referral services. *Id.* at 2286 (citation omitted).

To be sure, it is not difficult to imagine a potential commercial injury to realtors arising from Acuity's allegedly false advertising. Instead of identifying the referral fee as the injury,

suppose that a different group of realtors *refused* to join Acuity's network. Suppose further that these realtors alleged that they lost business because Acuity's purportedly false advertising caused home buyers and sellers to use Acuity's referral services and the competing realtors in Acuity's network. Even though this different group of realtors would not directly compete with Acuity (as compared to its network of realtors), this purported lost business may well qualify as "an injury to a commercial interest in . . . sales" that falls within the Act's zone of interests. *Lexmark*, 572 U.S. at 132. (These realtors would, of course, have to plead the Act's other elements, including, for example, its proximate-causation requirement. *See, e.g.*, *id.* at 132–34.)

But we need not decide this hypothetical case. Perhaps one could have read Lewis's complaint—charitably—to suggest that he alleged lost sales because Acuity's false advertising "divert[ed] potential business" toward other realtors. Compl., R.1, PageID 16. At oral argument, however, Lewis's counsel conceded that he alleged the payment of Acuity's referral fee as his *only* injury. Oral Arg., 34:50–35:05. Because Lewis incurred that specific injury as Acuity's customer, he failed to present a claim within the Lanham Act's zone of interests. *Lexmark*, 572 U.S. at 132.

Lewis lastly spent significant time at oral argument suggesting that Acuity's business model violates the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601–17. But his complaint did not assert a claim under this Act. So this argument is irrelevant in this case.

\* \* \*

All told, Lewis's complaint alleged consumer injuries that fall outside the Lanham Act's zone of interests. That fact independently dooms his lawsuit. We thus need not resolve whether he has adequately alleged that Acuity proximately caused any injury to him or engaged in commercial advertising under the Act.

We affirm.