RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

VICTORY GLOBAL, LLC,

                     *Plaintiff-Appellant*,

    *v.*

                            No. 25-5173

FRESH BOURBON, LLC,

                     *Defendant-Appellee*.

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:21-cv-00062—Karen K. Caldwell, District Judge.

Argued: December 10, 2025

Decided and Filed: March 26, 2026

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Brian M. Johnson, DICKINSON WRIGHT PLLC, Lexington, Kentucky, for Appellant. Perry Adanick, ROLFES HENRY CO., LPA, Louisville, Kentucky, for Appellee. **ON BRIEF:** Brian M. Johnson, DICKINSON WRIGHT PLLC, Lexington, Kentucky, for Appellant. Perry Adanick, ROLFES HENRY CO., LPA, Louisville, Kentucky, for Appellee.

─────────────

**OPINION**

─────────────

    MURPHY, Circuit Judge. Bourbon has been the cause of many Kentucky controversies. "The idea of 'the first distiller,'" for example, "has bemused Kentucky historians and writers for well over a century." Henry G. Crowgey, *Kentucky Bourbon: The Early Years of Whiskeymaking* 24 (1971). Was the first distiller Evan Williams? Elijah Craig? Some long-

forgotten settler? *See id.* at 24–25. And where was this drink first distilled—in Georgetown in 1789 or Fort Harrod in 1774? *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 415 (6th Cir. 2012).

This case involves a similar controversy: Which African American-owned company first distilled bourbon? Victory Global (which does business as Brough Brothers) claims to have become the "first" when it opened its physical distillery in 2020. But Fresh Bourbon counters that it was the "first" because its owners physically distilled their brand at another company's distillery two years earlier. Disagreeing with Fresh Bourbon's claim, Brough Brothers sued it for false advertising under the Lanham Act, 15 U.S.C. § 1125(a). Brough Brothers, though, fails to identify any unambiguously false statements that Fresh Bourbon made, so it had the burden to introduce evidence that Fresh Bourbon's statements had deceived consumers. It made no effort to do so. The district court thus properly granted summary judgment to Fresh Bourbon. We affirm.

I

Congress has designated bourbon as a "distinctive product" of the United States. S. Con. Res. 19, 88th Cong., 78 Stat. 1208 (1964); 27 C.F.R. § 5.143(b), (c) & tbl. 1. Yet Kentucky has a strong claim that bourbon represents a distinctive product of the Bluegrass State alone. *See Maker's Mark*, 679 F.3d at 414–16. This type of whiskey originated in Kentucky, *see id.* at 415, and some "95% of the world's bourbon" still gets made there, *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 855 (6th Cir. 2018).

Kentucky's bourbon industry consists of a mix of old and new. Most of the best-known distilleries sit on Kentucky's "Bourbon Trail." And some have a history tracing back to the Founding. *See Sazerac*, 892 F.3d at 855; *Maker's Mark*, 679 F.3d at 415–16. But the industry has not stood still. In recent decades, the bourbon market has seen an influx of small "craft" distilleries like the influx of craft brewers in the beer market. *See* Paul Coomes & Barry Kornstein for Ky. Distillers' Ass'n, *The Economic and Fiscal Impacts of the Distilling Industry in Kentucky* 2, 6–7, 43, 65–66 (Dec. 31, 2023).

To distinguish themselves, distillers have long relied not just on their bourbon's flavor but also on its branding. *See Maker's Mark*, 679 F.3d at 415. Think of the famous red-wax seal on every Maker's Mark bottle. *See id.* at 417. So some of the new craft distillers have marketed their bourbons to select audiences, such as baseball fans or military supporters. *See Our Story*, Big Bat Bourbon, https://www.bigbatbourbon.com/our-story; *Our Legacy*, Horse Soldier, https://horsesoldierbourbon.com/pages/our-story. Victory Global and Fresh Bourbon exemplify this trend because they both advertise that they are "African American-owned, produced, [and] distilled." Yarbrough Dep., R.70-4, PageID 773; *see* Edwards Dep., R.77-1, PageID 1458–60.

*Brough Brothers*. Three brothers (Victor, Chris, and Bryson Yarbrough) formed Victory Global in 2013. The company initially operated as an "import-export" distributor that shipped English cider to the United States and American craft beer and bourbon to England. Yarbrough Dep., R.70-4, PageID 773. After seeing bourbon sales catch "fire," the brothers decided to expand into bourbon production. *Id.*, PageID 774. Their first step involved many visits to distilleries to identify the "flavor profile" that they liked. *Id.* They settled on a "crossover bourbon" made for non-bourbon drinkers. *Id.*, PageID 777. As Victor Yarbrough explained, their bourbon is "light" and "smooth" with less alcohol by volume than others. *Id.*

To enter the market quickly, the Yarbrough brothers decided to "source" their bourbon—that is, to contract with another company to distill it for them. *Id.*, PageID 774. By August 2018, Victory Global had acquired a federal permit. The same month, it registered to do business as "Brough Brothers Distillery" with the Kentucky Secretary of State. Certificate, R.83-3, PageID 1942. The brothers sold their first batch of bourbon under the Brough Brothers label in 2020. An Indiana source distilled this product, so the bottles disclosed that the bourbon came from the Hoosier State.

In the meantime, the brothers took the steps necessary to do their own distilling. In 2018, Brough Brothers leased a building in Louisville for these operations. It renovated the building to turn it into a distillery over the next two years. By November 2020, the brothers had obtained state and city licenses to distill bourbon at this location. Bryson Yarbrough took on the role of master distiller. Brough Brothers filled its first barrel of Kentucky bourbon on New Year's Eve in 2020. Their distillery also opened for public tours in 2021. It can produce one 53-gallon

barrel of bourbon every six weeks. The company has since leased a larger building and eventually hopes to produce 20 barrels a month from there. That said, it has yet to sell its homemade Kentucky bourbon while waiting for this suit's completion.

*Fresh Bourbon*. A married couple (Sean and Tia Edwards) formed Fresh Bourbon in December 2017. Earlier that year, the Edwardses had decided to start a company that would make bourbon. Like the Yarbrough brothers, they first tasted "probably over a hundred bourbons to try to develop what type of taste [they] wanted to derive from the bourbon." Edwards Dep., R.70-2, PageID 745. It took them a few weeks to develop their recipe. They built it "off Tia's palate," choosing the grains that would match the bourbon she liked. *Id.* Ultimately, they preferred a "sweeter" taste that used a lot of "honey malt" and less rye. *Id.*, PageID 750.

Once Fresh Bourbon got its recipe, it faced a problem: it did not own a distillery or possess licenses to distill. In late 2017, a consultant introduced the Edwardses to Andrew Buchanan, the head distiller at Hartfield & Co. Distillery in Bourbon County, Kentucky. These parties hit it off once Buchanan saw the couple's "passion" for the business. Buchanan Dep., R.70-6, PageID 838. They entered a "handshake agreement" that allowed Fresh Bourbon to use "Hartfield and distill in [its] space" with Buchanan's assistance. Edwards Dep., R.70-2, PageID 741, 744.

Buchanan's oversight changed over time. He closely supervised the Edwardses as they distilled their first batch at Hartfield in early 2018. That May, though, the Edwardses distilled the next batch with less involvement from Buchanan. By the summer of 2018, Fresh Bourbon had hired Mike Adams as a master distiller to distill their bourbon at Hartfield. Things eventually reached a "point where [Fresh Bourbon employees] knew what they were doing" without Buchanan, and they had "free reign" of the distillery. Buchanan Dep., R.70-6, PageID 847.

Fresh Bourbon first sold the bourbon that it made at Hartfield in 2020. It used Hartfield's federal license (under the name Buchanan Griggs) to sell to distributors, and Hartfield would "funnel that money from the distributor[s] back to" Fresh Bourbon. *Id.*, PageID 841. The label

on the Fresh Bourbon bottle thus stated: "Distilled and Bottled by Buchanan Griggs Inc. Paris, Kentucky For Fresh Bourbon Distilling Company[.]"  Label App., R.73-21, PageID 1268.  Yet Fresh Bourbon owned the recipe for this bourbon, and Hartfield agreed not to make it for others.

Like Brough Brothers, Fresh Bourbon simultaneously took steps to operate its own distillery while working with Hartfield.  By the fall of 2022, it had obtained the necessary federal, state, and city licenses to distill at a location in Lexington.  It opened this distillery around the same time and distilled its first batch either in late 2022 or in early 2023.  The Edwardses also have plans to open a much larger Fresh Bourbon distillery in downtown Lexington.

This case arose out of the parties' marketing.  Brough Brothers and Fresh Bourbon both promote themselves as African American-owned companies.  But they dispute who was first.  The answer might depend on first *at what*.  For example, Victory Global incorporated in 2013 and registered its business name "Brough Brothers" in 2018.  Fresh Bourbon, by contrast, incorporated in between these dates in 2017.  Likewise, Brough Brothers obtained its licensing and opened its Louisville distillery by December 2020, whereas Fresh Bourbon did not obtain its licensing or open its Lexington distillery until September or October 2022.  On the other hand, Fresh Bourbon began to sell Kentucky-made bourbon (from Bourbon County, no less) in 2020, whereas Brough Brothers' sourced bourbon came from Indiana at this time.  And the Edwardses (along with their master distiller, Mike Adams) participated in the distilling process at Hartfield in 2018, but the Yarbrough brothers did not participate in their Indiana source's efforts to distill the Brough Brothers bourbon made in that State.

Given that Brough Brothers and Fresh Bourbon developed side by side, various sources have made different claims about who came first.  For example, soon after Brough Brothers opened its Louisville distillery in December 2020, one media source called the company "the first and only Black-owned distillery" in Kentucky.  Brewbound Article, R.73-9, PageID 1177.  Yet an earlier LEX 18 news article from February 2020 described Sean and Tia Edwards as "the first African-Americans to distill bourbon in Kentucky."  LEX 18 Article, R.73-11, PageID 1197.  This article quoted Sean as opining that "there were no African American distilleries in the state of Kentucky" and that there had been "no African Americans producing bourbon" since

slaves had done so. *Id.* The same month, the Kentucky Senate passed a resolution recognizing Fresh Bourbon. The resolution opined that "Fresh Bourbon Distilling Company is considered to be the first black-owned bourbon distillery in Kentucky," as well as the first company that "produces bourbon in the state of Kentucky with an African American Master Distiller . . . since slavery[.]" Resolution, R.70-3, PageID 768. Fresh Bourbon included a link to the resolution on its website and a copy of the resolution with a limited-edition batch of commemorative bottles. The company's X profile likewise suggested that it was "[t]he first bourbon developed grain to glass by African Americans in the state of Kentucky." X Profile, R.73-13, PageID 1212.

Brough Brothers took issue with some of Fresh Bourbon's claims. Brough Brothers, for instance, believed that Fresh Bourbon was misleading consumers by claiming to be the "first black owned distillery in Kentucky" or to have the "first African American Master Distiller in Kentucky since slavery." Compl., R.1, PageID 4. In March 2021, therefore, it sued Fresh Bourbon for (among other things) false advertising under the Lanham Act.

Both sides sought summary judgment. The district court granted summary judgment to Fresh Bourbon. *See Victory Glob., LLC v. Fresh Bourbon, LLC*, 2025 WL 366626, at *4–8 (E.D. Ky. Jan. 31, 2025). We review this summary-judgment decision de novo. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 728 (6th Cir. 2012).

II

A

The Lanham Act creates a private cause of action for businesses that believe they will suffer (or have suffered) an injury from false advertising. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014); *Lewis v. Acuity Real Est. Servs., LLC*, 63 F.4th 1114, 1117–19 (6th Cir. 2023). This cause of action allows a business to sue if a competitor "uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [the competitor's] or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B).

We have interpreted this language to establish a multi-part test. *See FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 452–53 (6th Cir. 2024). This test requires courts to ask five questions. First, did the defendant make a "false or misleading" factual claim about its product or its competitor's product? *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). Second, did this claim "actually" "deceive" (or "tend[] to deceive") "a substantial portion of the intended audience" (typically, consumers)? *Id.* Third, was the claim "material" in that it would "likely influence [a] deceived consumer's purchasing decisions"? *Id.* Fourth, did the defendant introduce the claim into interstate commerce? *Id.* And fifth, did the claim cause the plaintiff's injury? *Id.*

The parties debate only the first three elements here. The first one requires a "false or misleading" statement of *fact*. *See FedEx*, 97 F.4th at 452–53. This limit flows out of the statutory text, which repeatedly refers to factual claims (such as a "false or misleading description" or "representation of fact" about a product). 15 U.S.C. § 1125(a)(1). A business thus cannot sue a competitor over a subjective opinion or exaggerated "puffery" about the competitor's product. *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018); *Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 699–700 (6th Cir. 2003). Instead, a business may challenge only those statements that one can objectively verify as true or false. *See FedEx*, 97 F.4th at 453.

We have further divided actionable factual claims into two categories: those that are "literally false" and those that are merely "misleading." *See La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019). If a defendant makes a literally false statement, the defendant can identify no possible framing in which one could consider the statement true. *See FedEx*, 97 F.4th at 453. In other words, we can describe literally false claims as "bald-faced" or "over the top" falsehoods. *Id.* (citation omitted). A misleading statement, by contrast, requires a reader to engage in some mental processing to determine its truth or falsity. *Innovation Ventures*, 694 F.3d at 736. If, for example, an ambiguous statement is true under one interpretation but false under another, the statement qualifies as potentially misleading (not literally false). *See Wysong*, 889 F.3d at 271; *Innovation Ventures*, 694 F.3d at

736–37.  The same rule covers a technically true statement that lacks important details.  *See Am. Council*, 185 F.3d at 615–17.  When deciding which bucket a false statement falls into, the court must consider the statement's "full context" and read it with everything else in an advertisement. *FedEx*, 97 F.4th at 454 (citation omitted).

This distinction between literally false and misleading statements matters to the second element.  *See Wysong*, 889 F.3d at 270–71.  That element asks if the challenged statement has deceived or could deceive consumers.  *See Am. Council*, 185 F.3d at 613.  It thus implements the statutory causation requirement because a business is not "likely to be damaged" from a false advertisement that will not fool anyone.  15 U.S.C. § 1125(a)(1).  We "presume" that a literally false statement "actually deceived" consumers.  *Wysong*, 889 F.3d at 270–71; *see Am. Council*, 185 F.3d at 614.  But we do not accept this presumption for misleading claims.  Rather, we require plaintiffs to present proof of deception (often, consumer surveys) to challenge these claims.  *See Wysong*, 889 F.3d at 271.  The deception standard that these plaintiffs must meet depends on the remedy they seek.  *See Am. Council*, 185 F.3d at 618.  If they request lost-sales damages, they must show that a false statement "*actually* deceived" a "significant portion" of the viewing consumers.  *Wysong*, 889 F.3d at 271 (citation omitted).  If they seek injunctive relief (or so-called damage-control costs), they must show that a false statement had "a tendency to deceive" these consumers.  *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 690, 692–93 (6th Cir. 2000) (citation omitted).  Either way, if these plaintiffs lack evidence of deception, their claims that the defendant used misleading advertising cannot survive summary judgment. *See Stolle Mach. Co. v. RAM Precision Indus.*, 605 F. App'x 473, 487 (6th Cir. 2015).

Other circuits have split over whether the distinction between literally false and misleading statements also matters to the third element.  *Compare Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000), *with Select Comfort Corp. v Baxter*, 996 F.3d 925, 939–40 (8th Cir. 2021).  That element asks if the challenged claim was material to consumers. *See Am. Council*, 185 F.3d at 613.  It also implements the statutory causation requirement because a business is not "likely to be damaged" from a claim that will not affect a consumer's decision on which product to buy.  15 U.S.C. § 1125(a)(1); *see Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32–33 (2003); 4 J. Thomas McCarthy, *McCarthy on*

*Trademarks and Unfair Competition* § 27:35 (5th ed.), Westlaw (database updated Mar. 2026). The Fifth Circuit has stated that literally false statements trigger a presumption of materiality. *See Pizza Hut*, 227 F.3d at 497. But other courts have disagreed, suggesting that the Fifth Circuit confused the materiality and deception elements. *See Select Comfort*, 996 F.3d at 939–40; *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 67–68 (2d Cir. 2016); *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250–51 (11th Cir. 2002); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002). And while the Fifth Circuit cited our *American Council* decision in support, *see Pizza Hut*, 227 F.3d at 497, that case concerned the deception element, *see Am. Council*, 185 F.3d at 614–18. We thus have yet to weigh in on this split.

B

The district court rejected Brough Brothers' challenge to Fresh Bourbon's marketing on the second and third elements. *See Victory Glob.*, 2025 WL 366626, at *4–8. The court first held that Fresh Bourbon made, at most, misleading (not literally false) statements and that Brough Brothers failed to introduce evidence that the challenged statements deceived consumers. *Id.* at *2–6. The court next held that Brough Brothers failed to show that Fresh Bourbon's allegedly misleading statements materially affected consumer purchasing decisions. *Id.* at *7–8.

Because the district court's two holdings provided independent grounds to rule for Fresh Bourbon, we may affirm based on either one. *See Pichiorri v. Burghes*, 162 F.4th 745, 751 (6th Cir. 2025). And the circuit split on *materiality* leads us to avoid that question. We instead affirm because Brough Brothers' claims fail on *deception* grounds alone. On appeal, Brough Brothers does not argue that it introduced any evidence to show that Fresh Bourbon's statements deceived (or even had the tendency to deceive) "a significant number" of bourbon consumers. *Wysong*, 889 F.3d at 271. Brough Brothers instead argues that it need not present this type of evidence to withstand summary judgment because Fresh Bourbon made "literally false" claims that triggered a presumption of deception. *FedEx*, 97 F.4th at 453. We will consider each of the challenged claims in turn, grouping three similar statements into the same category. None meets the high bar for us to give them the "literally false" label. *See id.*

1. *The first to "distill," "produce," or "develop" Kentucky bourbon.* Brough Brothers first argues that Fresh Bourbon falsely described itself (or the Edwardses) as the first African Americans to distill, produce, or develop Kentucky bourbon since the Civil War. For example, Fresh Bourbon's profile on X called the company's bourbon the "first . . . *developed* grain to glass by African Americans in the state of Kentucky." X Profile, R.73-13, PageID 1212 (emphasis added). Similarly, a LEX 18 article suggested that Sean Edwards told the publisher that he had discovered while going through the "process" of starting a bourbon business that "[t]here had been no African Americans *producing* bourbon" since slaves had done so long ago. LEX 18 Article, R.73-11, PageID 1197 (emphasis added). The article itself (without attribution to the Edwardses) also characterized them as "the first African-Americans to *distill* bourbon in Kentucky." *Id.* (emphasis added). (Because Fresh Bourbon reposted a link to this article on its website, the parties do not dispute that we can attribute this statement to the company. Given the lack of adversarial briefing, we will assume the point.)

According to Brough Brothers, the verbs "distill," "produce," and "develop" all articulate the "unambiguously deceptive" message that Fresh Bourbon made Kentucky bourbon before any other African American distillery, including Brough Brothers. *FedEx*, 97 F.4th at 453 (quoting *Wysong*, 889 F.3d at 270). At the outset, though, Brough Brothers does not claim to have evidence that some *other* African American distillery preceded both companies. To the contrary, Brough Brothers would like to describe itself as first. So its expert conceded that it was "impossible to verify" whether other African American distilleries existed before these companies. Veach Rep., R.73-2, PageID 1102. He had "yet to find" "any written record of African Americans making whiskey before now, since the Civil War[.]" Veach Dep., R.70-5, PageID 817. At least with respect to other bourbon makers, then, Fresh Bourbon's statements are not "verifiable" as false on this record. *La.-Pac. Corp.*, 928 F.3d at 519.

Brough Brothers instead argues that the statements are literally false because they convey that Fresh Bourbon made bourbon at its *Lexington distillery* before Brough Brothers made bourbon at its *Louisville distillery*. Yet it is undisputed that Brough Brothers obtained its distilling licenses and made its first batch of bourbon at its own distillery in December 2020 *before* Fresh Bourbon completed the same tasks years later. If, then, the challenged statements

unambiguously suggested that Fresh Bourbon opened its physical location before Brough Brothers, they would likely be literally false.

But the statements "reasonably convey[]" a "different message[]": that Fresh Bourbon's agents made its Kentucky bourbon first—no matter the physical distillery at which it did so. *FedEx*, 97 F.4th at 453. And this understanding of the statement is true. The Edwardses (along with their master distiller, Mike Adams) participated in the distilling process for Fresh Bourbon at the Hartfield distillery starting in 2018. The first time they did so, the Edwardses helped Buchanan physically put the raw materials into the still and undertook the other necessary steps. Fresh Bourbon agents then took on more responsibility for each new batch. During this time, by contrast, the Yarbrough brothers sourced their bourbon from Indiana and did not help this producer in the distilling process. In short, the challenged statements are "ambiguous" and could convey a truthful idea under one interpretation of their meaning. *Am. Council*, 185 F.3d at 615. Because their truth or falsity "depends" on how consumers would interpret the message, they cannot qualify as literally false. *Innovation Ventures*, 694 F.3d at 737 (citation omitted).

Brough Brothers disagrees on legal and factual grounds. Legally, it argues that a party does not "distill," "produce," or "develop" bourbon unless the party obtains licenses to open a distillery. Appellant's Br. 23. And because Fresh Bourbon made bourbon at the Hartfield distillery until 2022, Brough Brothers claims that Hartfield (not Fresh Bourbon) distilled, produced, and developed this product. Indeed, Brough Brothers highlights that Fresh Bourbon's bottle stated that it was "[d]istilled . . . by Buchanan Griggs" for Fresh Bourbon. Label App., R.73-21, PageID 1268. But this technical claim has no place in the "literally false" calculus— which requires a "bald-faced" lie. *FedEx*, 97 F.4th at 453 (citation omitted). Fresh Bourbon's use of these verbs does not meet that high standard. In ordinary language, one would naturally say that a party distilled or produced bourbon when the party put the raw materials into a still and took the other steps necessary to create the alcoholic beverage at the end. And it is undisputed that the Edwardses engaged in those activities. These verbs also would remain accurate even if the party lacked a license. Consider that the bootleggers who "sustain[ed] the continued *production* of the drink during Prohibition" did so unlawfully. *Sazerac*, 892 F.3d at 855 (emphasis added). Taken to its logical end, then, Brough Brothers' claim would mean that these

bootleggers did not "produce" or "distill" bourbon. Its argument thus conflicts with the ordinary understanding of the words.

Factually, Brough Brothers argues that Fresh Bourbon's agents "merely purchased bourbon under contract on Hartfield's license" just like Brough Brothers did with its Indiana source. Appellant's Br. 26. But the undisputed record shows otherwise. Buchanan, Hartfield's head distiller, explained that Fresh Bourbon's team eventually had "free reign" of the distillery and could do pretty much "[e]verything" in the distilling process. Buchanan Dep., R.70-6, PageID 847. That level of involvement suffices to avoid the literally false category for claims that Fresh Bourbon distilled, produced, or developed the bourbon that it sold from Hartfield.

2. *"[C]onsidered to be the first black-owned distillery in Kentucky."* Brough Brothers next criticizes the Kentucky Senate's resolution praising Fresh Bourbon in February 2020. In this page-long resolution, the Kentucky Senate stated (among other things) that "Fresh Bourbon Distilling Company is considered to be the first black-owned bourbon distillery in Kentucky[.]" Resolution, R.70-3, PageID 768. And "members of the Senate" then "acknowledge[d] the importance of this being the first black-owned distillery in Kentucky." *Id.* Fresh Bourbon's website links to this resolution, even though Brough Brothers opened its Louisville distillery before Fresh Bourbon opened its Lexington one. So Brough Brothers argues that Fresh Bourbon has "use[d]" a literally "false" "representation of fact" in its marketing materials. 15 U.S.C. § 1125(a)(1).

We see two problems with this argument. For one thing, Brough Brothers identifies no evidence showing that Fresh Bourbon *itself* ever claimed to have opened the first African American-owned distillery in Kentucky. Indeed, the Edwardses have repeatedly acknowledged that Brough Brothers opened its physical location first. *See* Edwards Dep., R.77-1, PageID 1560. So Brough Brothers concedes that Fresh Bourbon has, at most, asserted only that the Kentucky Senate "considered" it to be the first. *Victory Glob.*, 2025 WL 366626, at *4; Appellant's Br. 18–19. That "statement"—even if "misleading"—is not literally false. *Am. Council*, 185 F.3d at 615. The Kentucky Senate did in fact issue the proclamation, and it did in fact identify Fresh Bourbon as "the first black-owned distillery in Kentucky." Resolution, R.70-3, PageID 768.

For another thing, the word "distillery" could mean different things in different contexts. True, modern dictionaries usually define "distillery" to mean the physical "works where distilling" happens. *Merriam-Webster Unabridged Dictionary* (Online ed. 2026). Also true, Kentucky law defines "distillery" to mean the "place or premises where distilled spirits are manufactured for sale, and which are registered in the office of any collector of internal revenue for the United States." Ky. Rev. Stat. § 241.010(30). But consumers do not necessarily flip open a dictionary or check statutes when evaluating products. And Fresh Bourbon introduced evidence that companies often call themselves a "distillery" even when they are "having a spirit bottled for" them by others. Knittel Rep., R.70-7, PageID 878. The bottle for Pappy Van Winkle, for example, states: "Bottled by Old Rip Van Winkle Distillery." *Id.*, PageID 879. But no physical "Old Rip Van Winkle Distillery" exists. *Id.*, PageID 880. The "Buffalo Trace Distillery" makes Pappy's. *Id.* Likewise, Brough Brothers registered the name "Brough Brothers *Distillery*" in 2018—years before it opened its physical location. Cert., R.83-3, PageID 1942 (emphasis added). And Buchanan suggested that a company could call itself a "distillery" if it was a "distilling company" even if it did not have a physical location. Buchanan Dep., R.70-6, PageID 840.

The resolution also suggests that the Kentucky Senate used "distillery" to mean a company that sells bourbon when it referred to Fresh Bourbon as the first. The resolution, for example, elsewhere stated that Fresh Bourbon had "announced that they plan to build" a physical distillery in Lexington. Resolution, R.70-3, PageID 768. Because the Kentucky Senate recognized that Fresh Bourbon had yet to open such a location, it would have made little sense for the resolution to refer to Fresh Bourbon's (unconstructed) venue as the first. And Brough Brothers' opening brief does not argue that the resolution's claim would have been false under the understanding of "distillery" that means a company that sells bourbon. After all, Fresh Bourbon sold Kentucky-made bourbon while Brough Brothers still sold Indiana-made bourbon. In short, the meaning of "distillery" *depends* on the context, and this "it depends" conclusion "cannot support a claim of literal falseness." *Innovation Ventures*, 694 F.3d at 737 (citation omitted).

In response, Brough Brothers argues that we should treat the Kentucky Senate's resolution as literally false because Fresh Bourbon played a role in drafting it. At the outset, Brough Brothers does not explain why a statement's author should affect whether the statement is literally false. Yet we need not decide that legal question because the evidence does not support the argument's underlying premise: that Fresh Bourbon proposed the allegedly false text. To the contrary, Sean Edwards proposed a Resolution that would say: "Fresh Bourbon Distilling Company in Lexington, Kentucky Founded in 2017, is hereby recognized as the First African American owned Company to produce Bourbon in the State of Kentucky with an African American Master Distiller Since Slavery." Texts, R.73-18, PageID 1247. This language did not include the statement that Brough Brothers now criticizes. So the Edwardses did not author it.

3. *"First African American-owned distillery coming to Lexington."* Unable to challenge the Kentucky Senate's resolution, Brough Brothers turns to criticizing two other statements in the LEX 18 article. The publisher entitled this article: "First African American-owned distillery coming to Lexington." LEX 18 Art., R.73-11, PageID 1196. And the article elsewhere quotes Edwards to have claimed: "As we went through the process we found out there were no African American distilleries in the state of Kentucky." *Id.*, PageID 1197.

Yet neither claim is literally false. As for the first, one could "reasonably" interpret the title to convey that Fresh Bourbon would qualify as the first African American-owned distillery located in the City of Lexington. *FedEx*, 97 F.4th at 453. That reading would render the title true because Brough Brothers' distillery is in Louisville, not Lexington. As for the second, Edwards made this statement in February 2020—well before Brough Brothers or Fresh Bourbon opened their respective locations. Edwards thus correctly explained that "no African American distilleries" existed "in the state of Kentucky" before then. LEX 18 Art., R.73-11, PageID 1197.

In response, Brough Brothers interprets the title to convey "that the first black-owned distillery in Kentucky (Fresh Bourbon) was . . . coming to Lexington." Appellant's Br. 21. Perhaps a reader might reasonably come away from the title with this different understanding. But that fact would only render the title "ambiguous" as to its meaning. *Am. Council*, 185 F.3d at 615–16. And we do not treat as literally false an ambiguous statement that is true under one reading and false under another. *See id.*; *see also* 4 McCarthy, *supra*, § 27:54 & n.8.

4. *The first "African American Master Distiller" since slavery.* Brough Brothers separately takes issue with one final claim in the Kentucky Senate's resolution. This resolution also stated that Fresh Bourbon "produces bourbon in the state of Kentucky with an African American Master Distiller, the first in Kentucky since slavery[.]" Resolution, R.70-3, PageID 768. It thus referred to Mike Adams, whom Fresh Bourbon hired as its "master distiller" in 2018. Edwards Dep., R.77-1, PageID 1373, 1383. According to Brough Brothers, this statement is literally false because Adams lacked the qualifications for the master-distiller title. To support this factual claim, Brough Brothers relies on its expert's suggestion that a master distiller typically has "20+ years of experience operating a distillery." Veach Rep., R.73-2, PageID 1102. It also points out that Adams worked full time at a bank and merely had an interest in bourbon as a hobby before he took the job with Fresh Bourbon.

This claim fails because the record shows that whether a producer qualifies as a "master distiller" depends less on objective "fact" and more on subjective "opinion." *Am. Council*, 185 F.3d at 614. As Buchanan explained, the phrase "master distiller" is "more of a symbol" that some distillers coined in their marketing to become "rock stars with the bourbon people." Buchanan Dep., R.70-6, PageID 835. It has evolved to have "no definition." *Id.*, PageID 836. So there is "no set experience level" or "no set anything" for that matter. *Id.* Indeed, the claim that a master distiller must have 20 years' experience would disqualify Brough Brothers' own master distiller: Bryson Yarbrough. *See* Yarbrough Dep., R.70-4, PageID 782–83. So the company's expert (conveniently) hedged to say that "[s]ome within the industry" also believe that distillery *owners* can qualify as master distillers no matter their experience. Veach Rep., R.73-2, PageID 1102. This expert thus agreed that "no published criteria" exist for the title. Veach Dep., R.70-5, PageID 819. Like Buchanan, he added that many view the master distiller as "more of a marketing person." *Id.* And he conceded that it "[b]asically" boils down to "a matter of opinion[.]" *Id.* But a plaintiff cannot sue over a "mere opinion" "under the Lanham Act." *Interactive Prods.*, 326 F.3d at 700.

\* \* \*

Failing to show that Fresh Bourbon *expressly* made a literally false statement, Brough Brothers ends with the claim that all its statements, taken together, "left . . . the clear impression

that Fresh Bourbon was the first black owned distillery in Kentucky." Appellant's Br. 28. True, we have suggested (in arguable dicta) that an advertisement can convey a false claim "by necessary implication" if consumers "would recognize the claim as readily as if it had been explicitly stated." *Innovation Ventures*, 694 F.3d at 735–36 (citation omitted). Some have "criticized" this category of literally false claims, 4 McCarthy, *supra*, § 27:54.50, but Brough Brothers seeks to expand it in a significant way. The company asks us to combine statements from *different sources* into one "overall marketing scheme" that left an implicit message that Fresh Bourbon opened its Lexington distillery first. Appellant's Br. 28. Although we must consider a single statement in the "full context" of an advertisement, *FedEx*, 97 F.4th at 454 (citation omitted), we have never treated every advertisement that a business has ever made as the relevant "context." *Cf. Apotex*, 823 F.3d at 67; *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 503 (4th Cir. 2015).

Ultimately, though, we may simply assume the validity of Brough Brothers' false-by-necessary-implication theory. Fresh Bourbon's collective statements were still, at most, ambiguous. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Even if they could convey the (false) claim that Fresh Bourbon opened its venue first, they could also convey the (true) claim that Fresh Bourbon made and sold Kentucky bourbon first. And courts do not treat as literally false a statement (whether express or implied) that a reader could take to convey both a truthful assertion and a mistaken one. *See id.*; 4 McCarthy, *supra*, § 27:54.

We affirm.